UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA

v.

JOSHUA POPE,

Defendant.

Criminal No. 4:26cr21

**MEMORANDUM OPINION**

On April 24, 2026, Defendant Joshua Pope ("Defendant" or "Mr. Pope") filed a Motion to Suppress (the "Motion to Suppress"). Mot., ECF No. 15. On June 2, 2026, the parties appeared before the Court for a hearing on the Motion to Suppress. Min. Entry, ECF No. 27. On July 10, 2026, the Court issued an Order denying the Motion to Suppress and noting that the Court's reasoning for its ruling would follow in a separate memorandum opinion. Order, ECF No. 30. This Memorandum Opinion provides the basis for the Court's ruling.

## I.    FACTUAL BACKGROUND[1]

On December 24, 2025, late in the evening, Newport News Police Department ("NNPD") Officer Conner Sutton ("Officer Sutton") and Officer Cadee Cintron ("Officer Cintron") responded to reports of a domestic assault at 373 Deputy Lane in Newport News, Virginia, based on an allegation that Mr. Pope had hit his wife, Patricia

---

[1] This factual background reflects evidence received at the hearing and set forth in the parties' submissions. Accordingly, any assertions herein without citations to the docket were derived from the June 2, 2026 hearing.

1

Pope ("Mrs. Pope"). Gov't Resp. Opp'n Ex. 5 at 2–6, ECF No. 21-5[2]; Gov't Resp. Opp'n at 1, ECF No. 21.

When Officers Sutton and Cintron arrived on scene, Mr. Pope had already left the apartment. Gov't Resp. Opp'n Ex. 1 at 00:47–00:54, ECF No. 21-1.[3] The officers spoke with Mr. Pope's female cousin, who said that Mrs. Pope had kicked everyone out. *Id.* at 00:57–00:59. Mr. Pope's cousin said that Mr. Pope just wanted the keys to his Nissan Maxima and GMC truck. *Id.* at 1:00–05. She told the officers that Mrs. Pope claimed that Mr. Pope smacked her, but "he didn't touch her." *Id.* at 1:22–26. Mr. Pope's family also told the officers that Mrs. Pope was intoxicated. *Id.* at 1:30–40.

The officers then asked Mr. Pope's cousin to clarify which cars he was trying to get access to, and whether the cars were registered to Mr. Pope. *Id.* at 2:20–27. When Mr. Pope's cousin confirmed that Mr. Pope was the registered owner of the cars, Officer Cintron explained that she could not force Mrs. Pope to hand over the keys to his family as they were not the registered owners, and that Mr. Pope would need to come back himself to get his keys. *Id.* at 2:28–36.

The officers then went inside to speak with Mrs. Pope. *Id.* at 3:08–3:34. Inside, the officers found Mrs. Pope crying, and Mr. Pope's daughter, A.D., standing against the wall. *Id.* at 3:40–3:52. Mrs. Pope stated that Mr. Pope had just been released from

---

[2] This Order uses ECF-generated pagination.

[3] Copies of Government Exhibits 1 through 4 were provided to the Court during and after the hearing. The citations to these exhibits refer to the timestamp on the video player, not to the timestamps in the upper right-hand corner of the video.

prison on September 24. *Id.* at 3:52–3:54. Mrs. Pope further reported that Mr. Pope had smacked her in front of everybody and shared that Mr. Pope is on federal probation. *Id.* at 4:10–23. She said that Mr. Pope's family members had taken Mr. Pope away and then had come back to try to get his keys. *Id.* at 4:41–44. She told the officers that she was scared because Mr. Pope had a gun that he was not supposed to have, that he has already told her he was "not going back [to prison] without a fight," that he has bullets, has a gun, and she feared he was "going to kill [her]." *Id.* at 4:44–5:24.

While Mrs. Pope was talking to the officers, she asked A.D. where Mr. Pope's "stuff" was: A.D. went upstairs and came back with a bag of bullets. *Id.* at 5:10–46. Officer Sutton then asked for, and Mrs. Pope provided, Mr. Pope's name, date of birth, and social security number. *Id.* at 5:48–6:13. Then, Mrs. Pope's mother and her mother's friend arrived. *Id.* at 6:15–18. Mrs. Pope reiterated that Mr. Pope was going to kill her. *Id.* at 6:21–30. A.D. came downstairs and gave a set of keys to Mrs. Pope. *Id.* at 6:30–35. Mrs. Pope then explained that Mr. Pope "beat [her] so bad and then tried to drown [her]." *Id.* at 6:35–38.

Mrs. Pope then told officers that Mr. Pope has two cars. *Id.* at 7:01–03. "There's a reason why he wants that car," she explained. *Id.* at 7:05–07. She offered to open his cars for the officers, stating: "I'll open that car. And you can search that car. And I'll give you permission if I'm allowed to." *Id.* at 7:07–12. Officer Cintron responded, "You cannot if you're not the owner of the vehicle." *Id.* at 7:12–14. "He wants to take

3

[the cars] because he knows there's probably something in there that he could get in trouble for having," Mrs. Pope said. *Id.* at 7:18–23.

The officers then asked Mrs. Pope to explain what happened. *Id.* at 8:04–8:31. Mrs. Pope told them that they had been hanging out, playing games with the kids, when a song played that Mr. Pope did not like. *Id.* at 8:42–56. Mrs. Pope reported that Mr. Pope smacked her face because he felt that it was "disrespectful" that she was singing along to it. *Id.* at 8:58–9:08. Mrs. Pope said that Mr. Pope hits her "constantly." *Id.* at 9:12–32. Officer Cintron asked, "So who was downstairs when he saw . . .?" *Id.* at 9:32–36. Mrs. Pope responded, "The one cousin that hauled him off." *Id.* at 9:36–37. Officer Cintron clarified, "No, I'm not worried about where he is, I want to know who saw it" to which Mrs. Pope repeatedly responded, "I don't know, I don't know." *Id.* at 9:37–45. Mrs. Pope's mother's friend then gestured toward A.D. and said, "she got smacked too, look at her face." *Id.* at 10:20–22.

While Mrs. Pope, her mother, and her mother's friend continued to speak to Officer Cintron, Officer Sutton spoke with A.D. in the kitchen. Gov't Ex. 4 at 10:26–12:35, ECF No. 21-4. A.D. told Officer Sutton that Mrs. Pope was "constantly taking hits from Mr. Pope," and even though she tried to talk to Mrs. Pope about it, Mrs. Pope kept "letting him back in." *Id.* at 10:37–11:02. Regarding that evening, A.D. thought that Mrs. Pope was being dramatic and that the incident was not a big deal because "it happens every day." *Id.* at 11:13–56.

Officer Cintron continued speaking with Mrs. Pope, and asked Mrs. Pope to confirm that the bag of bullets was not hers. Gov't Resp. Opp'n Ex. 1 at 11:41–44,

4

ECF No. 21-1. Mrs. Pope exclaimed, "No! I don't have a gun." *Id.* at 11:44–45. Officer Cintron then explained that at that moment, she did not have enough proof to conclude that Mr. Pope had a gun. *Id.* at 11:47–58. Officer Cintron said, "I have no proof of him having guns . . . even him having this [ammunition] in a random bag, I don't have proof that it was his bag or it's his." *Id.* at 11:54–12:00.

Mrs. Pope said that she was not going to leave her home and would kill him because he was going to come back and assault her. *Id.* at 13:30–44. "I'm so tired of this," she screamed. *Id.* at 13:44–46. "Nobody cares . . . I have a right to defend myself." *Id.* at 13:49–14:03. She then said that the "federal police . . . [saw] what he did to [her]." *Id.* at 14:10–14. She added, "they were mad that I helped him out of prison." *Id.* at 14:18–20.

Officer Cintron then explained that Mrs. Pope was saying that Mr. Pope smacked her across the face, but the others outside were saying that that did not happen. *Id.* at 14:38–43. Mrs. Pope laughed, and noted that A.D. also "got smacked." *Id.* at 14:42–50. Mrs. Pope then explained to the officers that Mr. Pope had hit A.D. in the face. *Id.* at 14:50–15:14. A.D. came downstairs, and Officer Sutton took a photo of her face. *Id.* at 15:45–16:03. A.D. then confirmed that she had been smacked in the face, and that she thought Mr. Pope had done it, but she was not sure. *Id.* at 16:44–51. Mrs. Pope then brought another bag of bullets and the gun case downstairs and told officers she wanted to give it to Mr. Pope's probation officer. *Id.* at 18:23–44.

The officers then went outside to talk to Mr. Pope's family. *Id.* at 20:34. Mr. Pope's cousin had Mr. Pope on the phone and put him on speakerphone. *Id.* at 21:40.

5

When officers asked Mr. Pope what happened, he explained that Mrs. Pope thought he was cheating on her, and then he mentioned something about "certain songs" that came on. *Id.* at 21:46–22:03. He then told officers that she "got in [his] face," his family escorted him out, and he left. *Id.* at 22:14–40. Officer Cintron then asked who hit his daughter. *Id.* at 22:40–42. Mr. Pope's cousin and a man standing next to her immediately said that no one hit her. *Id.* at 22:42–43. When Officer Cintron told them that A.D. had a big mark on her face, the man said she probably did it to herself. *Id.* at 22:43–23:02. Mr. Pope then said that his daughter "does a lot of things to herself." *Id.* at 23:09–15. Officers Cintron and Sutton reiterated that she could not force Mrs. Pope to give the car keys to anyone other than Mr. Pope. *Id.* at 23:52–24:20. Officer Sutton returned to his patrol car with Officer Cintron to update Sergeant Goff on the situation. Gov't Resp. Opp'n Ex. 4 at 24:52, ECF No. 21-4[4]; Gov't Resp. Opp'n Ex. 5 at 8, ECF No. 21-5. He then contacted the NNPD records unit, who told him that Mr. Pope was a six-time convicted felon. *Id.*

Officer Sutton came back inside to ask Mrs. Pope where the bag of bullets was located. Gov't Resp. Opp'n Ex. 2 at 1:13–18, ECF No. 21-2. He explained that if Mr. Pope is a convicted felon, he cannot have ammunition or firearms. *Id.* at 1:23–25. Officer Sutton asked Mrs. Pope about the gun she mentioned before. *Id.* at 1:44–47. Mrs. Pope replied, "There's a reason why he wants that car so bad. He always keeps a gun in the center console." *Id.* at 1:48–52. Officer Sutton asked her which car it was

---

[4] Officer Sutton testified that he turned his body camera off prior to talking to Sergeant Goff, which was normal practice.

in, and Mrs. Pope stated that Mr. Pope only has one gun, that he has been driving his Nissan more recently, and that he always keeps a gun in whatever car he is driving. *Id.* at 1:53–2:10.

Officer Sutton then asked her where Mr. Pope got the ammunition and the firearm box, and Mrs. Pope told them that she did not know. *Id.* at 2:33–36. Mrs. Pope said that she did not realize until that day that he had a box for the gun because she had never seen it before. *Id.* at 2:45–50. She then started to cry when she told the officers that he had pistol-whipped her with the gun. *Id.* at 2:51–3:00. She said she had seen him put the bag of bullets in his backpack before. *Id.* at 3:13–15. She told the officers that his family had tried to take the bag of bullets with them when they left because he told them to do so. *Id.* at 3:17–21.

Officer Sutton then told Mrs. Pope to put the bag of bullets on the ground and said he was going to put some gloves on. *Id.* at 3:33–35. She then exclaimed, "Oh, why, so now my fingerprints are on it?" *Id.* at 3:35–38. Officer Sutton reassured her that the officers saw her touch the bag, and then asked, "Are you a felon, too?" to which she replied, "Yes!" *Id.* at 3:39–42. Officer Sutton said, "For real? Girl! You can't be around that neither!" *Id.* at 3:42–45.[5]

---

[5] Mrs. Pope has a felony conviction for lying under oath to a federal judge. *See United States v. Patricia Neville*, No. 4:20cr57 (E.D. Va. Aug. 4, 2021). The agreed-upon statement of facts in that case provides that on July 15, 2019, Mr. Pope assaulted Mrs. Pope, and Mrs. Pope provided a statement that same day confirming that he did so. Statement of Facts ¶¶ 2, 4, *United States v. Neville*, No. 4:20cr57 (E.D. Va. Apr. 13, 2021), ECF No. 32. However, during a March 11, 2020 detention hearing for Mr. Pope, Mrs. Pope was recommended as a third-party custodian and took the stand to support her suitability. *Id.* ¶¶ 1–2. She was questioned regarding the statement she provided on July 15, 2019, indicating that Mr. Pope had assaulted her that day. *Id.* ¶

Officer Sutton then asked Mrs. Pope if she had the keys to the cars. *Id.* at 3:51–52. She initially replied no, but Mrs. Pope's mother chimed in, "Yes, you do." *Id.* at 3:52–56. Officer Cintron clarified that the officers were not asking for the keys in order to give them to Mr. Pope, and Mrs. Pope then confirmed that she had the keys. *Id.* at 3:54–4:03; Gov't Resp. Opp'n Ex. 3 at 2:45–52, ECF No. 21-3. Officer Sutton explained what he understood thus far, and he and Mrs. Pope had the following conversation:

> **Officer Sutton**: So, you're alleging to me that there is a firearm in the car, right?
> **Mrs. Pope**: Possibly.
> **Officer Sutton**: He is a felon, yes? Right. But you have given me your information that you believe there is one, okay? Based on that, I want to search the cars to see if there is a firearm, so we can link that back to him, okay? Is that something you'd be okay with us doing?
> **Mrs. Pope**: I'm perfectly fine with you doing that. For my safety.
> **Officer Sutton**: Can you grab me the keys then so I can do that real quick?

Gov't Resp. Opp'n Ex. 2 at 4:08–28, ECF No. 21-2. Mrs. Pope then asked A.D. to bring the keys to the cars downstairs. *Id.* at 4:28–31.

---

2. She denied that Mr. Pope had assaulted her on July 15, 2019, and instead claimed that another person had assaulted her, and refused to provide that person's name. *Id.* ¶ 3. In fact, Mr. Pope did assault Mrs. Pope on July 15, 2019. *Id.* ¶ 4. Mrs. Pope lied to Judge Lawrence R. Leonard in an effort to persuade him to release Mr. Pope into her custody. *Id.* Accordingly, on April 14, 2021, Mrs. Pope pled guilty to Obstruction of Justice, in violation of 18 U.S.C. § 1503. Plea Agreement, *United States v. Neville*, No. 4:20cr57 (E.D. Va. Apr. 13, 2021), ECF No. 31; Min. Entry, *United States v. Neville*, No. 4:20cr57 (E.D. Va. Apr. 14, 2021), ECF No. 33. On August 4, 2021, Mrs. Pope was sentenced by Judge David J. Novak to nine days of imprisonment, followed by one year of supervised release. Min. Entry, *United States v. Neville*, No. 4:20cr57 (E.D. Va. Aug. 4, 2021), ECF No. 40.

Officer Sutton then went out to talk to Mr. Pope's cousin. *Id.* at 6:08–6:40. He explained that Mrs. Pope was not willing to relinquish the keys and that she said she was going to give them to Mr. Pope's probation officer, or "PO." *Id.* at 6:37–45. Officer Sutton suggested that Mr. Pope could get the keys from his PO. *Id.* at 6:45–49. Mr. Pope's cousin then asked Officer Sutton whether Mr. Pope would go to jail if he came to get his keys while the officers were still there. *Id.* at 6:53–59. Officer Sutton paused, sighed, and said that there was more going on that the officers were trying to figure out. *Id.* at 7:02–17. He then suggested that Mr. Pope go through his PO because it would be the best way for everyone to avoid conflict that night. *Id.* at 7:18–23.

Meanwhile, Officer Cintron was inside speaking with Mrs. Pope and A.D., and Mrs. Pope asked A.D. how often she sees Mr. Pope with his gun on his hip, to which A.D. replied, "every time that he moves." Gov't Resp. Opp'n Ex. 3 at 9:01–08, ECF No. 21-3. Officer Cintron reiterated that the police were working to find the gun and tie it back to Mr. Pope. *Id.* at 9:09–9:20. Officer Cintron explained the protective order process and encouraged Mrs. Pope to file one. *Id.* at 12:40–13:24. Mrs. Pope then started to cry again and said that she was going to file for a protective order. *Id.* at 13:40–14:04.

Outside, Officer Sutton went to speak with Sergeant Winston once he finished speaking with Mr. Pope's family.[6] Gov't Resp. Opp'n Ex. 2 at 8:45, ECF No. 21-2. He said that he spoke with Mr. Pope's family and was just waiting for them to leave

---

[6] It is unclear to the Court from the record when Sergeant Winston arrived.

before searching the cars. *Id.* at 8:45–57. Officer Sutton and Sergeant Winston then had the following conversation:

> **Sergeant Winston:** We think there's a firearm in there?
> **Officer Sutton:** Yeah. We also have ammunition already, so at this point, if he comes back, he's getting arrested, but . . .
> **Sergeant Winston:** And we, uh, we believe that the firearm is in there based on the ammunition that we collected?
> **Officer Sutton:** The ammunition mixed with her statements. She's told us where he keeps it in the car and stuff like that.
> **Sergeant Winston:** And she's saying that it's his gun?
> **Officer Sutton:** Mmhmm.
> **Sergeant Goff:** Okay. And is this something that he totes with him regularly, or . . .
> **Officer Sutton:** Um, she said every time he drives the car, he keeps it in the center console.
> **Sergeant Goff:** So it is his gun, and he is the one that has control of it? He's the one that it belongs to?
> **Officer Sutton:** Yes.
> **Sergeant Goff:** Okay cool. And she's giving y'all, um, y'all going, has she given y'all . . .
> **Officer Sutton:** She's given us the keys, she's given us consent, we also have probable cause for what we got.
> **Sergeant Goff:** Okay. Cool.

*Id.* at 8:57–9:39. Sergeant Winston then confirmed that Officers Sutton and Cintron had "the green light" to search the cars. *Id.* at 10:25–29. Officer Sutton then searched both cars. *Id.* at 12:00–31:30. First, he entered the GMC truck. *Id.* at 13:00. He eventually found an empty pistol holder in the center console. *Id.* at 16:12. Then, he began searching the Nissan. *Id.* at 16:52. Officer Sutton found a pistol in the center console, as well as magazines and cartridges in the trunk. *Id.* at 17:03–35:05; Gov't Resp. Opp'n Ex. 5 at 9, ECF No. 21-5.

## II.  PROCEDURAL HISTORY

On March 9, 2026, a grand jury returned a one-count indictment against Mr. Pope, charging him with Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 1). Indictment, ECF No. 1. On March 23, 2026, Mr. Pope came before Magistrate Judge Douglas E. Miller for his initial appearance, arraignment, and detention hearing. Min. Entry, ECF No. 6. The Office of the Federal Public Defender was appointed as counsel, Mr. Pope was ordered detained pending trial, and a jury trial was scheduled to begin on June 1, 2026. *Id.*; Order, ECF No. 9.

On April 24, 2026, Mr. Pope filed the instant Motion to Suppress. Mot., ECF No. 15. On May 15, 2026, the Government responded in opposition. Gov't Resp. Opp'n, ECF No. 21. On May 19, 2026, the Court struck the jury trial scheduled for June 1, 2026 from its calendar and set a hearing on the Motion to Suppress for June 2, 2026. Order, ECF No. 22. On May 21, 2026, Mr. Pope filed his reply. Reply, ECF No. 23.

On June 2, 2026, the parties came before the Court for a hearing on the Motion to Suppress. Min. Entry, ECF No. 27. On July 10, 2026, the Court issued an Order denying the Motion to Suppress and noting that the "reasons for the Court's ruling [would] follow in a separate memorandum opinion." Order, ECF No. 30. This Memorandum Opinion provides the basis for the Court's ruling.

## III.  LEGAL STANDARD

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV; *see United States v.*

*Gray*, 491 F.3d 138, 144 (4th Cir. 2007). Warrantless searches of "property in which individuals have a reasonable expectation of privacy," *United States v. Davis*, 997 F.3d 191, 203 (4th Cir. 2021), are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2002) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)).

"To prevail in a Fourth Amendment challenge, the criminal defendant bears the burden of establishing a legitimate expectation of privacy in the searched property, at the time of the search, by a preponderance of the evidence." *United States v. Daniels*, 41 F.4th 412, 415 (4th Cir. 2022). After the defendant establishes a reasonable expectation of privacy, the burden shifts to the government, which must demonstrate, by a preponderance of the evidence, that at least one of the exceptions to the warrant requirement applies. *United States v. Bell*, 825 F. Supp. 3d 612, 616 (E.D. Va. 2025). If the government does not carry this burden, any "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Mayberry*, 125 F.4th 132, 144 (4th Cir. 2025) (quoting *United States v. Calandra*, 414 U.S. 338, 347–48 (1974)).

## IV.   ANALYSIS

This Motion is before the Court to determine whether there was a Fourth Amendment violation, and if so, whether suppression is warranted and to what extent. First, the Court considers whether Mr. Pope had a reasonable expectation of

privacy in his vehicles. Second, the Court considers whether the automobile exception applies.

### A.   Reasonable Expectation of Privacy

On December 24, 2025, the police conducted warrantless searches of Mr. Pope's two cars. The parties do not dispute that Mr. Pope was the owner of the two cars at issue, and that he therefore had a reasonable expectation of privacy giving rise to a cognizable Fourth Amendment interest. *See generally* Mot., ECF No. 15; Gov't Resp. Opp'n, ECF No. 21. Accordingly, the burden shifts to the Government, which must prove by a preponderance of the evidence that an exception to the warrant require-ment applies. *Bell*, 825 F. Supp. 3d at 616.

### B.   The Automobile Exception

The Government argues that the automobile exception applies. See Gov't Resp. Opp'n at 13–17, ECF No. 21. "Under the automobile exception, the police can search a vehicle without first obtaining a warrant if the vehicle is [(1)] readily mobile and [(2)] probable cause exists to believe it contains contraband." *Davis*, 997 F.3d at 200–01 (internal quotation marks omitted). The Court considers each prong in turn.

#### 1.   *Readily Mobile*

The first factor is easily met. For a car to be "readily mobile," it is not necessary to find that "someone would have driven the car away during the time it would have taken the police to secure a warrant." *United States v. Kelly*, 592 F.3d 586, 591 (4th Cir. 2010) (citing *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam)). The car simply needs to be "operational." *United States v. Brookins*, 345 F.3d 231, 238

(4th Cir. 2003). Mr. Pope did not contest that his two cars were "readily mobile." *See* Reply at 1, ECF No. 23. Therefore, the first prong of the automobile exception is met.

### 2.    *Probable Cause*

Turning to the second factor, "[p]robable cause exists when the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Davis*, 997 F.3d at 201 (quoting *United States v. Patiutka*, 804 F.3d 684, 690 (4th Cir. 2015)) (internal quotation marks omitted). "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Probable cause "depends on the totality of the circumstances" and is a "fluid concept." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Here, the Court finds that the NNPD had probable cause to search Mr. Pope's vehicles based on the totality of the circumstances. The Court will first summarize the salient facts which would lead an officer of reasonable of prudence to believe a firearm would be found in Mr. Pope's vehicles, and then consider Mr. Pope's arguments to the contrary.

### a.    *The NNPD had probable cause.*

When the officers arrived and spoke with Mr. Pope's family, they immediately inquired about getting the keys to Mr. Pope's cars. This was the first clue to the

14

officers that something nefarious might be contained therein. Thereafter, upon entering the Pope residence, Mrs. Pope was similarly insistent to the officers that she would not give Mr. Pope's keys to his family. The officers learned that Mr. Pope was recently released from prison and was on federal probation. Mrs. Pope then told the officers that she was scared of Mr. Pope and informed them that he possessed a gun and a bag of bullets. Mr. Pope's daughter, A.D., then went upstairs and retrieved the bag of bullets.

Though Mrs. Pope was clearly intoxicated on the evening of December 24, 2025, her speech was not slurred and, at the officers' request, she readily provided Mr. Pope's name, date of birth, and social security number without difficulty. Mrs. Pope then informed the officers that Mr. Pope has two cars, and stated, "There's a reason why he wants that car . . .he wants to take [the cars] because he knows there's probably something in there that he could get in trouble for having." Govt. Resp. Opp'n Ex. 1 at 7:07–23, ECF No. 21-1. At this stage, the officers expressed some skepticism as to whether they had sufficient probable cause that Mr. Pope had a gun. Officer Cintron explained that she did not have enough proof to conclude that Mr. Pope had a gun, or that the ammunition bag belonged to Mr. Pope. However, probable cause, is "fluid," and more details would later emerge. *Wesby*, 583 U.S. at 57. Mrs. Pope offered to provide more proof, including the gun case.

After more discussion with the officers, Mrs. Pope eventually brought downstairs another bag of bullets and a gun case and told the officers that she wanted to give it to Mr. Pope's probation officer. After speaking again with Mr. Pope's family

outside the residence, Officer Sutton returned to his patrol car to update Sergeant Goff on the situation. Gov't Ex. 5 at 7, ECF No. 21-5. Officer Sutton then contacted the NNPD records unit, who informed him that Mr. Pope is a six-time convicted felon. *Id.* At this stage, probable cause began to emerge that Mr. Pope was a felon in possession of a firearm.

Thereafter, Officer Sutton went back inside the residence. Mrs. Pope again stated, "There's a reason why he wants that car so bad . . . he always keeps a gun in the center console." Gov't Resp. Opp'n Ex. 2 at 1:48–52, ECF No. 21-2. She then informed the officers that Mr. Pope keeps the firearm in whatever car he is driving, that she had seen the bag of bullets in his backpack before, and that the family had tried to take the bag of bullets with them when they left because Mr. Pope asked them to do so. Officer Sutton then asked Mrs. Pope, "So you're alleging to me that there is a firearm in the car, right?" and Mrs. Pope responded, "Possibly." *Id.* at 4:08–28. A.D. later informed Officer Cintron that Mr. Pope has his gun on his hip "every time he moves." Gov't Resp. Opp'n Ex. 3 at 9:01–08, ECF No. 21-3. Officer Sutton and Sergeant Winston then had a conversation, wherein Officer Sutton informed his sergeant that based upon Mrs. Pope's statements about where Mr. Pope usually keeps his gun and that he always has the gun with him when he drives, and based upon the ammunition provided, they had probable cause to search the vehicles. Gov't Resp. Opp'n Ex. 2 at 8:57–9:39, ECF No. 21-2.

The aforementioned facts established three "factual bridges" between the firearm and the vehicles—(1) Mrs. Pope's statements that he always kept his firearm in

16

the car; (2) Mr. Pope's family's repeated requests for the keys to his cars; and (3) Mrs. Pope's repeated conjectures that there was a reason his family kept asking for the keys. *See United States v. Wilson*, 153 F.4th 478, 485 (5th Cir. 2025) ("'[T]he fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house [or car] for evidence of that crime. One concerns the person; the other concerns the place. And the Constitution demands a factual bridge between the two.'") (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)).

The Court finds that the totality of the circumstances were more than sufficient to give the officers probable cause to believe that one of Mr. Pope's vehicles contained a firearm. Probable cause is not a "high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Here, it is clear that the officers approached their probable cause determination with fluidity—they initially did not feel that they had enough footing upon which they could justify a search of Mr. Pope's vehicle but later gathered additional information that formed the basis for probable cause. Weighing the physical evidence that Mrs. Pope had provided—bags of bullets and the gun case, along with confirmation from A.D. that Mr. Pope frequently carried a gun, Mr. Pope's felony status, and his family's dogged interest in obtaining the keys to the cars—the officers determined that the bar for probable cause to search Mr. Pope's cars—which is not a high one—had been met. The Court agrees.

> b.    *Mr. Pope's arguments against probable cause do not outweigh the totality of the circumstances.*

Mr. Pope raised several arguments, both in his pleadings and at the June 2 hearing, to poke holes in the probable cause finding. Mot. at 6–11, ECF No. 15. First, he argues that Mrs. Pope stated only that the gun was "possibly" in one of the cars. *Id.* at 6–7. Second, he argues that the Fourth Amendment does not allow police to reach the probable cause threshold by aggregating alternative places to be searched— here, the two vehicles. *Id.* at 7. Third, Defendant argues that Mrs. Pope stated that Mr. Pope kept a firearm in his vehicle whenever he was driving, and here, he was plainly not driving. *Id.* at 8. Fourth, he argues that Mrs. Pope was not a credible witness and had a motive to fabricate evidence against her husband. *Id.* at 8–10.

The Court will respond briefly to each of these arguments in turn. First, it would by hyper technical for the Court to view Mrs. Pope's statement that a firearm was "possibly" in one of the cars as an assertion to the police that it did not rise to a "probable" level. Lay people do not often understand the "legal significance of terms of art such as 'probable cause' or 'reasonable suspicion.'" *United States v. Pearson*, No. 1:18cr295, 2019 WL 1440875, at *5 (S.D. Ind. Apr. 1, 2019). Additionally, Mrs. Pope's statement could be interpreted as a hesitancy to *promise* police that they would find a firearm in the vehicles, out of concern that the police would be upset with her if they did not find one.

Second, defense counsel's aggregation argument is sound in theory, but defense fails to offer a similar case finding that police cannot simultaneously develop probable

18

cause that a firearm could be found in one of two vehicles, both of which are owned and used by one person. The Court searched for and has also not located any such cases. In the Court's view, the totality of the circumstances established probable cause for the police to search *both* vehicles—perhaps with a slightly stronger foundation to search the Nissan since Mrs. Pope stated that Mr. Pope had been driving that vehicle more often.

Third, the Court is unmoved by defense's argument that, because Mr. Pope was not driving on the evening of December 24, it was improbable that the firearm was in his car. The more logical interpretation of those statements is that whenever Mr. Pope leaves his house to go somewhere, he gets into his car and has his firearm. But December 24, 2025 was different. Mr. Pope's family rushed him away from the residence to avoid escalation. It appears a cousin drove him away because Mr. Pope was also intoxicated. He and his family were then insistent that he come back to get his cars. Those circumstances actually reinforce the reasonable likelihood that—even though Mr. Pope left—the firearm remained in one of his cars. Further, since Mr. Pope and his family knew the police were being called, it was indeed wise for Mr. Pope to stay away from the vehicles in which his firearm was kept so that he could not be caught outright with a firearm or ammunition in his possession.

Finally, with respect to Mrs. Pope's credibility, defense counsel points out that Mrs. Pope: (1) was visibly upset and intoxicated; (2) is a previously convicted felon herself for lying to a federal judge; (3) committed  a felony in the officers' presence by possessing ammunition as a felon; (4) changed her story regarding who was present

during the alleged assault that occurred—a story that was contradicted by multiple witnesses; (5) intentionally lied to police about whether she had the keys to the cars; and (6) had a motive to fabricate evidence against Mr. Pope. Mot. at 8–9, ECF No. 15. The Government similarly weighed in on Mrs. Pope's credibility, arguing that: (1) A.D. and Mrs. Pope's mother confirmed that Mr. Pope regularly hit her—in contravention to the other witnesses who contradicted her story; and (2) throughout the evening, Mr. Pope cried several times and showed genuine fear of Mr. Pope. Gov't Resp. Opp'n at 15–16, ECF No. 21. Having reviewed the video exhibits and considered the testimony provided at the hearing, on balance, the Court finds a reasonable person could have found Mrs. Pope to be credible, as the officers did here. Her demeanor and tone of voice were consistent with someone who had just been assaulted and was both fearful and angry. Mrs. Pope was insistent that the keys not be given back to Mr. Pope. She was also forthcoming about her felony conviction when asked. The law does not require police to only rely on the statements of perfect witnesses when considering whether there is a reasonable likelihood they will find evidence of a crime in the place they seek to search.

The Court again reiterates that the "totality-of-the-circumstances test" precludes any sort of "'divide-and-conquer analysis.'" *District of Columbia v. R.W.*, 146 S. Ct. 1069, 1072 (2026) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Because "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation," *Wesby*, 583 U.S. at 60–61, a court reviewing a probable cause determination under the totality of the circumstances cannot excise and review

"facts piecemeal and without context." *R.W.*, 146 S. Ct. at 1072. Here, when viewed individually, these points might be seen as weaknesses to the probable cause determination; however, when viewed as a whole, the Court finds that the officers had probable cause to search Mr. Pope's vehicles. Therefore, the Government has established that the automobile exception applies to the warrantless search of Mr. Pope's vehicles. As such, Mr. Pope has not prevailed in his Fourth Amendment challenge, and suppression is not warranted.

## V.  CONCLUSION

As stated in the Court's previous Order (ECF No. 30), and for the foregoing reasons, the Motion (ECF No. 15) is **DENIED**. The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

/s/
Arenda L. Wright Allen
Senior United States District Judge

July 31, 2026
Norfolk, Virginia